## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHERRY ANDERSON<br>481 Dawson Avenue<br>Apartment 307<br>Pittsburgh, PA 15202<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>ALLEGHENY CORRECTIONAL<br>HEALTH SERVICES<br>3333 Forbes Avenue<br>Pittsburgh, Pa 15213<br><br>and<br><br>ALLEGHENY COUNTY<br>Allegheny County Court House<br>436 Grant Street<br>Pittsburgh, Pa 15219<br><br>and<br><br>DANA PHILLIPS, individually<br>and in her official capacity as<br>President of Allegheny Correctional<br>Health Services Inc.<br><br>and<br><br>KIMBERLY M. WILSON, individually<br>and in her official capacity as<br>Director of Nursing for<br>Allegheny Correctional<br>Health Services Inc.<br><br>　　　　　　Defendants. | CIVIL ACTION<br><br>NO: _____<br><br>JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT

AND NOW comes Plaintiff, Sherry Anderson, who, by and through her undersigned counsel, hereby avers as follows:

### I.      Introduction

1. Plaintiff initiates this action to seek redress against Defendants for wrongful discharge, violations of the Pennsylvania Whistleblower Statue, retaliation for engaging in First Amendment activity under 42 U.S.C. § 1983, and other applicable law.

### II.      Parties

2. Plaintiff Sherry Anderson (hereinafter "Plaintiff") is an adult individual with an address located at 481 Dawson Avenue, Apartment 307, Pittsburgh, Pa. 15202.

3. Defendant, Allegheny County Correctional Health Services, Inc., is a Pennsylvania non-stock, non-profit municipal corporation created by Defendant Allegheny County through the Allegheny County Health Department and incorporated under the laws of the Commonwealth of Pennsylvania, for the purpose of insuring the availability and the provision of Medical Care at the Allegheny County Jail.

4. Allegheny County Correctional Health Services, Inc., acts as an agent, servant, employee and/or subordinate of local state agency Allegheny County health Department, which is itself an arm of Defendant, Allegheny County.

5. Allegheny County Correctional Services, Inc. and the Allegheny County Health Department represented the legal authority and official policy of Allegheny County with respect to the maintenance of the health and safety of inmates incarcerated in the Allegheny County jail.

6. At all times relevant hereto, Defendant Allegheny County was a legal state agency organizing and existing under the laws of the Commonwealth of Pennsylvania, authorized to

maintain the Allegheny County Jail for the purposes of safely detaining, incarcerating and rehabilitating citizens and inhabitants of Allegheny County through the Allegheny County Bureau of Prisons.

7. By virtue of its conduct, through its agents, servants and employees, in detaining, incarcerating, protecting and rehabilitating inmates at the Allegheny County jail, Defendant Allegheny County, through the Allegheny County Health Department and then Allegheny County Correctional Health Services, Inc., expressly assumed the duties of maintaining the health and safety of all inmates with respect to the provision and availability of adequate medical care and the maintenance of appropriate medical standards at the Allegheny County Jail.

8. By virtue of its conduct in the creation and incorporation of Defendant Allegheny Correctional Health Services, Inc., and Defendant Allegheny County expressly assumed the duties of maintaining the health and safety of inmates in respect to the provision and availability of adequate medical care at the Allegheny County jail.

9. The maintenance and provision of adequate medical care to inmates within the Allegheny County jail are operations and functions of the Defendant, Allegheny County.

10. Dana Phillips is President and Chief operating officer of Allegheny Correctional Health Services, Inc., and is sued both individually and in her official capacity as President and Chief Operating Officer.

11. Defendant Kimberly M. Wilson is the Director of Nursing for Allegheny County Correctional Health Services, Inc.,

12. At all times relevant hereto, Plaintiff, was a Registered Nurse whose duty it was to care for inmates.

13. Plaintiff was employed by the Allegheny Correctional Health Services, Inc., itself an agent and legal authority and enforcer of the official health policy for Defendant Allegheny County and acting under state law.

### III. Jurisdiction and Venue

14. The Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

15. The United States District Court for the Western District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law.

16. Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Defendants are located in and conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district (Plaintiff was employed in the Western District of Pennsylvania at the time of the unlawful actions set forth herein).

17. This complaint predicates violations of 42 U.S.C. § 1983, under color of state law, of Plaintiff's rights secured by the Constitution of the United States and made applicable to the states through the Fourth and Fourteenth Amendment.

18. This Court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(A).

## IV.     Factual Background

19.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

20.     Plaintiff started working at the Allegheny County jail in March 2009.

21.     Plaintiff is a registered nurse.

22.     Plaintiff worked with all medical cases including diabetic intake and in the infirmary when she was first hired.

23.     Plaintiff was originally hired through an agency but in December 2009, she was hired by Defendant Allegheny Correctional Health Services (hereinafter referred to as "ACHS").

24.     Shortly thereafter, Plaintiff accepted the full-time daylight charge nurse position in the prison infirmary and worked in that position until November 9, 2011.

25.     Plaintiff reported to Kim Gasser, R.N. and Director of Nursing until the spring of 2011.

26.     Kim Gasser's position was then taken by Kim Mike-Wilson who became Assistant Director of Nursing along with Jim Dusch.

27.     Defendant Dana Phillips is the Chief Operating Officer of all medical departments for ACHS and reported to Bruce Dixon, M.D., Head of Health Department until May 2012 when Ronald Voorhees took over the health department.

28.     On Monday, November 7, 2011, Defendant ACHS and Allegheny County prison, were subject to their health inspection, referred to as a National Commission on Correctional Care (hereinafter NCCHC) inspection.

29.     Plaintiff was on the daylight shift on November 8, 2011 and came in Tuesday evening for the midnight shift and stayed through the daylight shift until November 9, 2011.

30. When Plaintiff arrived, she received a report from the evening nurse who informed her that the female inspector had stated that the prison was so bad that the inspection was not going to finish because intake and provisions to mental health inmates were so below standard that the NCCHC (the accreditation agency) was going to leave and fail the prison on health grounds.

31. Dana Phillips requested that NCCHC give Defendant one more chance.

32. The next day, the inspector came back to inspect the infirmary.

33. Dana Phillips made the entire infirmary staff hide all expired medications hidden in "biohazard" boxes so the inspectors would not see them.

34. Plaintiff accidentally made a medical error by giving an inmate two vicodin instead of one and because of that error, Plaintiff was improperly suspended for three days without pay.

35. Defendants' disciplinary policy calls for a verbal warning, then a written warning, and then a one day suspension followed by a three day suspension.

36. Plaintiff had never been written up before and should have received a verbal warning.

37. Medical errors have been frequent and no prison medical personnel have been suspended, let alone removed from their position.

38. Plaintiff was also removed from her position as charge nurse in the infirmary and then was placed wherever Defendants thought she was needed.

39. On November 10, 2011, the level 5 medical card count was off and two Klonopin were unaccounted for.

40. Chevelle Chambers, LPN discovered the error.

41. There was no investigation and no one was suspended.

42. On Plaintiff's return from her suspension on November 14, 2011, Plaintiff was in the infirmary and witnessed a narcotic count of the infirmary cart.

43. The Methadone count was off and two extra Vicodin were wasted.

44. No one was suspended and there was no investigation.

45. On the same day at 10:03 p.m., Plaintiff was standing outside the infirmary waiting for control to open the door when Plaintiff witnessed Valerie Slepsky, a medical assistant, give inmate John Jones a dose of insulin.

46. Correctional Officer Danny O'Donnell was also present at the time.

47. Plaintiff went to Kim M. Wilson, Director of Nursing, and Jim Dusch, Assistant Director of Nursing because Slepsky was not licensed or qualified to dispense insulin.

48. Defendants took no action despite the clear violation of Pennsylvania law and Defendants' protocols.

49. During Thanksgiving week of 2011, Plaintiff was made to work in the pharmacy with another R.N., Jane Gentile.

50. On one of those days, Dana Phillips called and ordered Plaintiff and the other R.N. to dispense narcotics to an inmate who was about to be released.

51. Both Ms. Gentile and the Plaintiff refused because they were not pharmacists and were not permitted to dispense medication.

52. Dana Phillips made Jim Dusch come in from home to give the inmate two cards of 10 mg of Valium with multiple doses on them.

53. Jim Dusch was similarly unqualified to dispense the aforesaid medication.

54. Internal Affairs allegedly investigated this improper distribution of narcotics and no discipline or any other action was taken.

55. On December 8, 2011, Plaintiff was assigned to diabetics and when she arrived in the morning, the cart count was off.

56. Once again, nothing was done.

57. There was no investigation and no one was suspended.

58. On December 30, 2011, Plaintiff was again assigned to diabetics and when she arrived in the morning, the cart was off again and once again, nothing was done, no investigation ensued and no one was suspended.

59. On April 12, 2012, the Allegheny County jail was due for a follow-up inspection.

60. In the few days before the inspection, Dana Phillips and Jim Dusch packed up thousands of dollars' worth of medications that the County had paid for and removed them from the jail, placing them in their cars when so the medications would not be in the building when the inspectors came.

61. The packing up and storage of these medications is recorded on videotape.

62. Dana Phillips and Jim Dusch attempted to force Brendan from medical records to assist them but he refused because he thought removal of prescription medication to their personal vehicles was illegal.

63. These medications were never brought back to the facility after the inspection.

64. On information and belief, the medications were destroyed or wasted because a dispenser, which was supposed to issue meds for each inmate in little envelopes with their names on it, was utilized.

65. The medication dispenser never worked correctly and hundreds of thousands of dollars in medication was wasted.

66. Dana Phillips and ACHS concealed this waste to the inspectors.

67. All inmates going into the jail first go to a "level 4", which is the intake for both males and females.

68. All females are housed and remain on level four in Parts D, E and F.

69. All males first go to level four A, B and C parts to be detoxed if necessary and then classified. Once classified, they are moved through the building and the worse the crime, the higher the level in the building, with level 8 being maximum security.

70. Level 8, Part E is solitary confinement or "the hole" as it is called.

71. Derek Black, an inmate, was housed on 4C and got into a fight with another inmate, one Ahmed Alghizzi.

72. Both inmates were sent to the "hole".

73. All inmates are sent to the "hole" until they have a hearing.

74. Derek Black was housed on 8E with no access to the phone.

75. Derek Black was not permitted any privileges when he was put into and remained in solitary confinement.

76. Medications on Level 8E are dispensed on foot with the nurse or other personnel, entitled to dispense the medication, walking from cell to cell with a prison guard.

77. The prison guard opens a slot in the door and the medications are administered through the slot.

78. When Plaintiff was passing medications to Derek Black, he told her that he had been coughing up blood and that no one would see him.

79. He further said that the correctional officers had kept calling for medical assistance but no medical personnel had seen him.

80. Plaintiff went to the infirmary after her shift and put Derek Black on the priority list.

81. Despite having put Derek Black on the priority list, he still was not seen by any medical personnel.

82. Correctional officers kept calling the infirmary and requesting medical attention for Derek Black, but still, medical attention was refused and no one came to see him.

83. Finally, the 8E officers called and spoke to Chris Marsh, R.N.

84. Chris Marsh is so lazy that she will not walk to pass her meds from cell to cell, but instead scoots around on a chair with wheels.

85. Chris Marsh, R.N. refused to see Derek Black.

86. Instead, she sent the medical assistant, Slepsky, who had neither the skills nor the education to medically assess anyone.

87. Slepsky went to 8E and determined (incorrectly) that Derek Black was allegedly "faking".

88. Derek Black was not seen for at least another day.

89. Finally, when he was seen, he was sent to the hospital.

90. Derek Black "coded" in the ER and died in the Intensive Care Unit.

91. Derek Black had suffered a punctured lung in the fight with Alghizzi and as a consequence was coughing up blood.

92. Following Slepsky's incorrect and incompetent assessment that Derek Black had been "faking", Plaintiff complained to Kim M. Wilson about the fact that a medical assistant had been sent to see an inmate who Plaintiff had put down as a medical priority.

93. Kim M. Wilson told Plaintiff to mind her own business.

94. Kim M. Wilson then retaliated against Plaintiff, taking her off of her medical assignment and putting her in the intake unit to keep her away from everyone else who worked for Defendant ACHS.

95. Plaintiff later found out that Derek Black had died.

96. When Plaintiff found out that Derek Black had died, she went to Kim M. Wilson's supervisor, Dana Phillips, and told her how she (Plaintiff) had put Derek Black on the priority list and how Valerie Slepsky (someone not medically competent) had declared Derek Black to be faking and that no one had seen Derek Black, despite his continual symptoms and requests for help.

97. Dana Phillips again told the Plaintiff to mind her own business.

98. Dana Phillips told Plaintiff that she was no longer in charge of the infirmary and that if she wanted to keep her job she had better keep her mouth shut.

99. After some time had passed and Plaintiff saw that Defendants Phillips, Wilson and ACHS were going to do absolutely nothing about the death of Derek Black and that they had, for all intents and purposes, covered it up, Plaintiff went again to Dana Phillips and told her that she was going to call Ronald Voorhees at the county health department, (who Plaintiff knew was Dana Phillips' new boss,) unless something was done to investigate Derek Black's death and the circumstances thereof.

100. Plaintiff did not get a chance to call Ronald Voorhees, because she was fired less than a week later.

101. Plaintiff was fired for allegedly going outside of the jail during her shift to smoke.

102. Plaintiff was not the only person who would go out to smoke.

103. At least six other employees went outside to smoke as much, if not more, than Plaintiff, and were not fired.

104. These employees are Lynn Fuga, Tim Wick, Valerie Slepsky, Deena Farren, Tara Slifkey and Jen Swiderski.

105. None of these individuals were fired, suspended or even written up.

106. When Plaintiff was called on June 26, 2012, to be terminated on the foregoing pretextual basis, she asked to see the policy justifying her termination.

107. Defendants could not produce it.

108. Plaintiff also asked about the other individuals who engaged in the same conduct, named in paragraph 104 above, and was told it was none of her business.

109. It should also be noted that Kim M. Wilson's daughter, Courtney, left the prison every day and retuned without ever clocking out, thereby getting paid for hours she was not present.

110. Kim M. Wilson hired her daughter as a "medical assistant" despite the fact that she never had even one day of training.

111. Kim M. Wilson then moved a full-time employee from her position on 5D to give Courtney the full-time daylight position, and, when a full-time employee complained, Courtney threatened her with physical violence.

112. The employee wrote up the incident and notified corrections Captain Coleman of the threat.

113. Dana Phillips called the employee who was threatened by Courtney into her office and threatened to fire her for going outside the chain of command and for notifying corrections.

114. The employee now works in fear because Courtney informed her and others that she was "kicked out of public school for beating people up."

115. On information and belief, there is a protocol which states that no employee should directly supervise any family members and Kim M. Wilson has supervised her daughter Courtney from day one.

### COUNT I

### PLAINTIFF VS. ALL DEFENDANTS

### WRONGFUL DISCHARGE
### (VIOLATION OF PUBLIC POLICY)

116. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

117. If the discharge of an employee threatens the public policy of the Commonwealth of Pennsylvania, the employee may maintain a cause of action against the employer for wrongful discharge.

118. The public policy exception to the at-will employment doctrine is applicable where the employer requires the employee to commit a crime and the employee refuses to do so. *See, e.g., McLaughlin v. Gastrointestinal Specialists, Inc.,* 696 A.2d 173, 176 (Pa. Super. 1997).

119. Plaintiff was fired for refusing to commit criminal activity.

120. In particular, refusal to violate, 35 P.S. § 780-113 (2012), known as the THE CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT (hereinafter 'The Act')

121. Prohibited acts the Plaintiff refused to engage in violation of the Act included but were not limited to: '(4) The removal or disposal of a detained or embargoed substance or article, whether or not such substance or article is in fact adulterated or misbranded.' In this

case referring to the removal and disposal of hundreds of medications removed by Phillips and ACHS so they would not be inspected.

122.    '(10) The sale at retail of a nonproprietary drug except by a registered pharmacist in a licensed pharmacy or by a practitioner.' This section refers to Plaintiff's refusal to dispense a controlled substance to an inmate.

123.    '(11) The operation of a drug manufacturing, distributing or retailing establishment, except by registered pharmacists in a licensed pharmacy, without conforming with such standards respecting sanitation, materials, equipment and supplies as the secretary, after consultation with the board, may establish by regulation for the protection of the public health and safety.' This section also refers to Plaintiff's refusal to dispense a controlled substance to an inmate.

124.    '(12) The acquisition or obtaining of possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge.' This section refers to the removal of hundreds of medications paid for by Allegheny County by ACHS and Dana Phillips.

125.    '(13) The sale, dispensing, distribution, prescription or gift by any practitioner otherwise authorized by law so to do of any controlled substance to any person known to such practitioner to be or whom such practitioner has reason to know is a drug dependent person, unless said drug is prescribed, administered, dispensed or given, for the cure or treatment of some malady other than drug dependency, except that the council, in accordance with Federal narcotic and food and drug laws, shall allocate the responsibility for approving and designating certain clinics, and shall provide or allocate the responsibility for providing regulations for such clinics at which controlled substances, including but not limited to methadone, may be prescribed, administered or dispensed for the treatment of drug dependency. This clause shall

not prohibit any practitioner from prescribing, distributing or dispensing any controlled substance for a period of time not to exceed fourteen days pending confirmed admission of the patient to a hospital or rehabilitation center.' This section refers to the Plaintiff's refusal to dispense valium to an inmate who was about to be released onto the street.

126.　'(14) The administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.' This section also refers to the Plaintiff's refusal to dispense vicodin to an inmate who was about to be released onto the street.

127.　' (15) The sale at retail or dispensing of any controlled substance listed in Schedules II, III and IV to any person, except to one authorized by law to sell, dispense, prescribe or possess such substances, unless upon the written or oral prescription of a person licensed by law to prescribe such drug and unless compounded or dispensed by a registered pharmacist or pharmacy intern under the immediate personal supervision of a registered pharmacist, or the refilling of a written or oral prescription order for a drug, unless such refilling is authorized by the prescriber either in the original written prescription order or by written confirmation of the original oral prescription order.' This section refers to the Plaintiff's refusal to dispense vicodin to an inmate who was about to be released onto the street.

128.　'(16) Knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, unless the substance was obtained directly from, or pursuant to, a valid prescription order or order of a practitioner, or except as otherwise authorized by this

act.' This section refers to the Plaintiff's refusal to dispense vicodin to an inmate who was about to be released onto the street.

129.    ' (19) The intentional purchase or knowing receipt in commerce by any person of any controlled substance, other drug or device from any person not authorized by law to sell, distribute, dispense or otherwise deal in such controlled substance, other drug or device.' This section refers to the Plaintiff's refusal to dispense vicodin to an inmate who was about to be released onto the street.

130.    '(23) The unauthorized removing, breaking, injuring, or defacing a seal placed upon embargoed substances or the removal or disposal of substances so placed under seal.' This section refers to the removal of hundreds of medications paid for by Allegheny County by ACHS and Dana Phillips.

131.    '(28) The furnishing of false or fraudulent material information in or omission of any material information from any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act.' This section refers to the removal of hundreds of medications paid for by Allegheny County by ACHS and Dana Phillips and the fraudulent report generated to the inspectors as a consequence.

132.    The Act also states; 'Any person who violates any of the provisions of clauses (1) through (11), (13) and (15) through (20) or (37) of subsection (a) shall be guilty of a misdemeanor, and except for clauses (4), (6), (7), (8), (9) and (19) shall, on conviction thereof, be sentenced to imprisonment not exceeding one year or to pay a fine not exceeding five thousand dollars ($ 5,000), or both, and for clauses (4), (6), (7), (8), (9) and (19) shall, on conviction thereof, be sentenced to imprisonment not exceeding three years or to pay a fine not exceeding five thousand dollars ($ 5,000), or both; but, if the violation is committed after a prior

conviction of such person for a violation of this act under this section has become final, such person shall be sentenced to imprisonment not exceeding three years or to pay a fine not exceeding twenty-five thousand dollars ($25,000), or both.'

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor and against Defendants Dana Phillips, Kim Wilson and ACHS for compensatory and punitive damages in an amount in excess of $100,000.00 and against the remaining Defendants for compensatory damages in excess of $100,000.

## COUNT II
## PLAINTIFF VS. ALL DEFENDANTS

### WRONGFUL DISCHARGE
### (PLAINTIFF'S OBJECTIONS TO A COURSE OF CONDUCT BY DEFENDANT THAT WAS PLAINLY ILLEGAL)

133. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

134. It is submitted that a public policy exception to the at will rule exists when a Plaintiff objects to a course of action that the employer is taking that is clearly illegal." *Kelly v. Ret. Pension Plan for Certain Home Office, Managerial and Other Employees of Provident Mutual*, 73 Fed. Appx. 543, 544 (3d Cir. 2003); *see also Clark v. Modern Group Ltd.*, 9 F.3d 321, 330 (3d Cir. 1993).

135. In this case, as set forth in detail in Count 1, the actions of the Defendants were clearly illegal in that they involved violations of 35 P.S. § 780-113 (2012), known as the THE CONTROLLED SUBSTANCE, DRUG, DEVICE AND COSMETIC ACT.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor and against Defendants Dana Phillips, Kim Wilson and ACHS for compensatory and punitive

damages in an amount in excess of $100,000.00 and against the remaining Defendants for compensatory damages in excess of $100,000.

## COUNT III
### PLAINTIFF VS. DEFENDANTS ALLEGHENY COUNTY AND ACHS VIOLATIONS OF THE PENNSYLVANIA WHISTLEBLOWER STATUTE

136.   The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

137.   The Whistleblower law, 43 § 1421 *et seq*., makes it unlawful for an employer to: "discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation terms, conditions, locations or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer, or appropriate authority an instance of wrongdoing or waste."

138.   An "employer" is defined, pursuant to 43 P.S. § 1423(a) as a "person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body."

139.   An "employee" is defined as a "person who performs a service for wages or remuneration under contract of hire, written or oral, expressed or implied for a public body." *Id.* § 1422.

140.   A "public body" includes a "body which is created by commonwealth or political subdivision or authority or which is funded in any amount by or through commonwealth or political subdivision or a member or employee of that body." *Id.*

141.   Defendants are public bodies by virtue of the fact that they are funded by and through the Commonwealth.

142. As stated herein above, in more detail, Plaintiff set forth and communicated to her employer, a number of good faith reports regarding wrongdoing or waste.

143. In particular, the wrongdoing included but was not limited to the improper distribution of drugs, the improper disposal of those drugs, the improper hiring of a medical assistant who was not qualified, the failure to properly treat Derek Black and the cover-up regarding his death and the refusal of the Defendants to investigate his death and the ongoing threats received by Plaintiff for refusing to keep quiet regarding the ongoing problems affecting the Defendants ability to take care of and treat inmates.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor and against Defendants for compensatory in excess of $100,000.

## COUNT IV
## PLAINTIFF VS. ALL DEFENDANTS
## RETALIATION FOR ENGAGING IN FIRST AMENDMENT ACTIVITY
## UNDER 42 USC § 1983

144. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

145. Plaintiff made statements about the death of Derek Black and that an investigation into his death should occur.

146. Plaintiff was not in the infirmary at the time and had no affirmative duty, pursuant to her position as Registered Nurse to request such an investigation.

147. These concerns were spoken by Plaintiff as a matter of public concern given the manner in which Derek Black had died.

148. The request for an investigation was raised not pursuant to her official duties, but as a concerned citizen regarding an inmate who had not received proper medical treatment and who had died as a consequence.

149. Plaintiff requested the investigation after Derek Black had died and not as a part of her job duties but because she was concerned as a citizen of the Commonwealth of Pennsylvania.

150. Because Defendants did not have an adequate justification for terminating the Plaintiff given the fact that six individuals, who Plaintiff identified, were never subjected to the discipline or the adverse employment decision, imposed on the Plaintiff, it is submitted that Plaintiff's speech in requesting an investigation of Derek Black's death was a substantial factor or the substantial factor in her termination.

**WHEREFORE**, Plaintiff requests that judgment be entered in her favor and against the Defendants for compensatory damages in an amount in excess of $100,000.

KOLMAN ELY, P.C.

By: /s/ Timothy M. Kolman, Esquire
Timothy M. Kolman, Esquire
414 Hulmeville Avenue
Penndel, PA  19047
(215) 750-3134
Attorney for Plaintiff

September 14, 2012